UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHAD FULLER,

        Plaintiff,                    CIVIL ACTION NO. 12-15662

     v.                                DISTRICT JUDGE GEORGE CARAM STEEH

                                       MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 9, 12)

Plaintiff Chad Fuller challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 9, 12). Judge George Caram Steeh referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 2).

**I.    RECOMMENDATION**

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

**II.    DISCUSSION**

        ***A.  Framework for Disability Determinations***

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B. *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th

Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A. *Administrative Proceedings*

Plaintiff applied for disability insurance benefits on March 9, 2010, alleging a disability onset date of February 28, 2008 (Tr. 22); the Commissioner denied the application (Tr. 22). Plaintiff appeared before ALJ Regina Sobrino with counsel on August 22, 2011 (Tr. 22); in a September 17, 2011 written decision, ALJ Sobrino found Plaintiff was not disabled prior to March 30, 2010, but became disabled on that date (Tr. 22-32). Plaintiff requested an Appeals Council review, and, on November 1, 2012, the ALJ's decision became the final decision of the Commissioner when the Appeals Council declined further review (Tr. 1-3).

#### B. *ALJ Findings*

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his alleged disability onset date in 2008 (Tr. 24).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative disc disease,[1] degenerative joint disease,[2] bipolar disorder, and an anxiety-related disorder (Tr. 24).

At step three, the ALJ found no evidence, prior to March 30, 2010, that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 24). But, the ALJ found that as of March 30, 2010, the severity of Plaintiff's impairments met the criteria for listing 12.04 (Tr. 29).[3]

Between steps three and four, the ALJ found, prior to March 30, 2010, Plaintiff had the Residual Functional Capacity ("RFC") to perform:

---

[1] "Degenerative disc disease is a spinal condition caused by the breakdown of [the] intervertebral discs." *See* http://www.mayfieldclinic.com/PE-DDD.htm (last visited December 9, 2013).

[2] "Osteoarthritis [, also known as Degenerative joint disease,] is the most common joint disorder, which is due to aging and wear and tear on a joint." *See* http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (last visited December 9, 2013).

[3] Listing 12.04 provides, in relevant part, that an individual satisfies the listing when there is:

> [m]edically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration, or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate . . . .

20 C.F.R. § 404, App. 1 to Subpart P, Listing 12.04.

> Light work[4] . . . with the following additional limitations: no climbing of ladders; occasional climbing of stairs; occasional stooping and crouching; and no exposure to hazards. He was limited to simple, routine, repetitive work including 1- and 2- step tasks. He could perform low stress work (*i.e.*, no fast-paced work, no work that involves quotas, no assembly line work) that did not involve interaction with the public, or more than occasional and superficial contact with co-workers and supervisors.

(Tr. 25).

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work (Tr. 28).

At step five, the ALJ found Plaintiff was not disabled prior to March 30, 2010, because he could have performed a significant number of jobs in the national economy such as cleaner, stock clerk, and general office clerk (Tr. 28-29). But, Plaintiff *became* disabled on March 30, 2010, and has been disabled through the date of the ALJ's decision (Tr. 32).

---

[4] Light work involves:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

C. *Administrative Record*

1. **Plaintiff's Hearing Testimony and Statements**[5]

Plaintiff has a GED and past work as a sales clerk and a truck driver (Tr. 37, 49).[6] He stopped working on February 28, 2008, because he had a nervous breakdown (Tr. 37-38).[7]

Plaintiff has rheumatoid arthritis;[8] his doctor prescribes medications and cortisone shots as needed (Tr. 39-40). His condition is worsening, and he anticipates that he will soon need to begin a new, monthly cortisone shot regimen that he can self-administer at home (Tr. 40). Plaintiff also has problems with his memory and concentration (Tr. 45). He takes Abilify;[9] Lexapro;[10] Plaquenil[11] and Mavic,[12] which upset his stomach; Xanax,[13] which makes him sleepy;

---

[5] Plaintiff's testimony before the ALJ reflects his subjective view of his medical condition, abilities, and limitations. It is set forth from Plaintiff's perspective; it is not a factual finding of the ALJ or this Magistrate Judge.

[6] The VE classified Plaintiff's past work at the start of her testimony; Plaintiff agreed that he had previously performed both of those jobs full-time (Tr. 49).

[7] Treatment notes consistently indicate that Plaintiff reported experiencing a nervous breakdown in 2001 (*See, e.g.,* Tr. 342, 344-50).

[8] Rheumatoid arthritis is "a chronic systemic disease primarily of the joints, usually polyarticular, marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones. In late stages deformity and ankylosis develop." *Dorland's Illustrated Medical Dictionary*, 152-59 (31st Ed. 2007).

[9] "[Abilify] is a medication that works in the brain to treat schizophrenia. It is also known as a second generation antipsychotic (SGA) or atypical antipsychotic. [Abilify] rebalances dopamine and serotonin to improve thinking, mood, and behavior." *See* http://www.nami.org/Template.cfm?Section=About_Medications&template=/ContentManagement/ContentDisplay.cfm&ContentID=8133 (last accessed Dec. 10, 2013).

[10] "Lexapro (escitalopram) is an antidepressant belonging to the class of selective serotonin reuptake inhibitors (SSRIs). Lexapro is used to treat anxiety in adults and major depressive disorder in adults . . . ." *See* http://www.rxlist.com/lexapro-side-effects-drug-center.htm (last accessed Dec. 10, 2013).

-7-

and, Vicodin (Tr. 42). Dr. Rizik is his family doctor; Dr. Nagarkar is his psychiatrist (Tr. 42, 46) – he began seeing him in July of 2008, and was seeing him every three months at the time of the hearing (Tr. 42, 46); and, James Rivist is his therapist, though he had not seen him in a while (Tr. 42). Since he stopped working, Plaintiff has gone to the emergency room for panic attacks, but has not stayed overnight – he has been given a shot to calm him down, then released (Tr. 43).

Plaintiff reported that he could stand and walk for fifteen minutes at a time on bad days; but on good days, he could stand for 30 minutes (Tr. 38-39). He did not require a cane (Tr. 39). Plaintiff could sit for 30 minutes before he needed to stand (*Id.*). With his left hand, he has trouble holding a pen or pencil; picking up coins; reaching; and, holding a gallon of milk (though it is not as difficult to hold in his right hand) (Tr. 39-40). Because of his joint problems, Plaintiff has trouble bending his knees; crouching; and, going up and down stairs (Tr. 40).

Plaintiff can do household chores for short periods of time; his wife shops for groceries; he has no trouble bathing or dressing himself; he rides his lawnmower to cut the grass; and, he drives very little (Tr. 40-41). When he does drive, he typically stays close to home (Tr. 41-42).

---

[11] "[Plaquenil] is [] used in the treatment of arthritis to help relieve inflammation, swelling, stiffness, and joint pain and to help control the symptoms of lupus erythematosus (lupus; SLE)." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010621/?report=details (last accessed Dec. 10, 2013).

[12] "[Mavic] is used alone or together with other medicines to treat high blood pressure (hypertension). . . A lower blood pressure can reduce the risk of strokes and heart attacks." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012490/?report=details (last accessed Dec. 10, 2013).

[13] "[Xanax] is used to relieve symptoms of anxiety, including anxiety caused by depression. It is also used to treat panic disorder in some patients." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008896/?report=details (last accessed Dec. 10, 2013).

Plaintiff's sleep is "horrible": pain forces him to lie on one side for fifteen minutes, before his discomfort forces him to turn over to the other side – he does this throughout the night (Tr. 45).

Depending on his mood, Plaintiff often stays in his house (Tr. 46). He does not socialize as much as he used to: he "just can't go out in public as much" (Tr. 41). Nor has he participated in any of his former hobbies since February of 2008; Plaintiff used to work on snowmobiles – he had sponsors and a race team – but he has not done this since 2008 (Tr. 41, 44-45).

### 2. Relevant Medical Evidence[14]

#### a. *Physical Limitations*

On April 16, 2008, imaging of Plaintiff's lumbar spine was negative (Tr. 269). On April 19, 2008, an MRI of the lumbar spine showed normal conus medullaris; some disc desiccation at L5-S1 with mild disc space narrowing; no subluxation; no focal disc herniation at T12-L1 through L4-L5; and, at L5-S1, broad-based left subarticular disc protrusion with no significant impression on the thecal sac and only mild left foraminal narrowing (Tr. 270).

On May 1, 2008, Mary Ellen Rinks, MSPT completed a physical therapy discharge evaluation (Tr. 284-85). Plaintiff reported his pain as a 1 out of 10 initially; a 4 to 5 without Vicodin; and, a 6 after he had been working on a motor (Tr. 284). She noted that Plaintiff was seen twice for physical therapy, but failed to show up for his third treatment (*Id.*). During that time, Rinks was able to initiate exercise with him and believed Plaintiff was "very motivated to try to do his exercises on his own" – Plaintiff left physical therapy feeling better and with much better alignment (Tr. 284-85).

---

[14] Because Plaintiff asserts error as to the ALJ's determination of his impairments prior to March 30, 2010, only relevant medical records within that time period are discussed here.

On December 19, 2008, a CT of Plaintiff's cervical spine revealed no significant degenerative changes (Tr. 261).

On May 27, 2009, an MRI of Plaintiff's lumbar spine showed redemonstration of shallow left central/left subarticular disc protrusion, and no significant ventral impression on the thecal sac and mild to moderate left inferior foraminal narrowing (Tr. 259). The remainder of the study was unremarkable (*Id.*).

On June 16, 2009, Kavitha Reddy, M.D. evaluated Plaintiff (Tr. 279-81). He complained of chronic and gradually worsening lower back pain, with some associated numbness, but no associated weakness of the lower extremities (Tr. 279). Plaintiff's pain was aggravated by sitting and walking, but well-controlled to a 1 to 2 out of 10 with medications (*Id.*). Plaintiff did not require an assistive device, and reported being independent in most activities of daily living (Tr. 279-80). Dr. Reddy prescribed Vicodin and advised a home exercise program, stretching, and a follow-up with Plaintiff's primary care physician (Tr. 280).

On September 15, 2009, Plaintiff was seen by Vivekanand Palavali, M.D. (Tr. 277) He reported gradually worsening pain aggravated by prolonged sitting, and no leg pain or numbness, but some leg weakness (*Id.*). He was treated with physical therapy and some anti-inflammatory medication (*Id.*). Dr. Palavali observed a negative straight leg test, normal gait, and no spine tenderness; he noted that "[s]ince the patient has not been maintaining [a] home exercise program for lower back after his physical therapy a few months ago I recommend that he undergo PT first and then continue exercises at home on a regular basis for a couple of months and see if his pain improves to a tolerable extent" (Tr. 277-78).

### b. *Mental Limitations*

On March 17, 2008, Plaintiff presented to James A. Rivest, M.A., Limited License Psychologist (LLP) with panic, depression, and mood swings – he had experienced a nervous breakdown in 2001 (Tr. 344-50). LLP Rivest diagnosed him with bipolar disorder and generalized anxiety disorder (Tr. 350). Plaintiff reported being emotionally confused and unable to talk on the phone or drive a truck; and, he would curl up on the couch and cry for two to three days at a time (*Id.*)

On March 22, 2008, Plaintiff saw Michael Gotlib, M.D. for a psychiatric evaluation (Tr. 342). He complained of panic, depression, and mood swings; and, he noted that in 2001 he had experienced a nervous breakdown (*Id.*). Dr. Gotlib found Plaintiff had dysthymic mood; coherent speech; appropriate affect; unremarkable psychomotor behavior; no suicidal ideations or perceptual disturbance; logical thought process; and, was fully oriented with no problems in concentration or memory (*Id.*). Dr. Gotlib diagnosed him with bipolar disorder and assigned him a GAF of 45 (Tr. 343).[15] He prescribed Klonopin,[16] Paxil,[17] and Lithium (*Id.*).[18]

---

[15] The GAF score is:

> a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 n. 7 (6th Cir. 2006).

On April 1, 2008, Plaintiff reported "bizarre symptoms": his mind was going places that he did not understand, and he was nervous all the time (Tr. 340). Dr. Gotlib was concerned that Plaintiff's new psychiatric symptoms might be "some malingering symptomatology" – Plaintiff had been on his medications for only eight days (*Id.*). He recommended Plaintiff visit a neurologist for a neurological exam and CT scan (*Id.*). Plaintiff requested sick leave, and Dr. Gotlib gave him from March 22 to May 22 – any additional time, and Dr. Gotlib would require that Plaintiff see a forensic psychiatrist (*Id.*). On exam, Dr. Gotlib noted that Plaintiff was alert and oriented times three, was experiencing no hallucinations or suicidal ideations, and his mood was euthymic (*Id.*).

On May 8, 2008, Plaintiff presented for a medication refill; he was still having anxiety attacks, and treatment notes indicate that he was anxious and in moderate distress (Tr. 228). On May 14, 2008, Plaintiff saw LLP Rivest (Tr. 330). He discussed severe financial problems, stress, and spontaneous generalized anxiety; he felt overwhelmed and emotionally ready to shut

---

[16] "[Klonopin] is [] used to treat panic disorder in some patients. Clonazepam is a benzodiazepine. Benzodiazepines belong to the group of medicines called central nervous system (CNS) depressants, which are medicines that slow down the nervous system." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009677/?report=details (last accessed Dec. 9, 2013).

[17] Paxil "[t]reats depression, obsessive-compulsive disorder (OCD), panic disorder, social anxiety disorder, . . . generalized anxiety disorder (GAD), and posttraumatic stress disorder (PTSD). . . This medicine is a selective serotonin reuptake inhibitor (SSRI)." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011606/?report=details (last accessed Dec. 9, 2013).

[18] "Lithium is used to treat and prevent episodes of mania (frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Lithium is in a class of medications called antimanic agents. It works by decreasing abnormal activity in the brain." *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html (last accessed Dec. 9, 2013).

down; and, he reported spending most of his time at home, alone (*Id.*). Plaintiff realized that he needed to network with family and friends for support (*Id.*).

On May 16, 2008, Plaintiff saw Dr. Gotlib and requested to be taken off work for another two weeks (Tr. 339). He reported lying on the couch and crying, and being unable to function: he did not think that he could ever return to work (*Id.*). Dr. Gotlib informed Plaintiff that his clinic did not do continuing long term disability, and suggested Plaintiff find a forensic psychiatrist to deal with disability issues (*Id.*). On exam, Dr. Gotlib found Plaintiff was alert and oriented times three; and, had a euthymic mood, no auditory or visual hallucinations, and no suicidal ideations (*Id.*).

On July 10, 2008, Sachin Nagarkar, M.D. evaluated Plaintiff: he reported decreased interest in playing cards and socializing; decreased concentration and memory; symptoms of guilt, fatigue, irritability, and worry; but, no change in weight (Tr. 282, 400). Plaintiff said that he wished he were dead (*Id.*). His mental status exam showed him to be alert and oriented, times three, with intact organic parameters and no suicidal ideation (Tr. 283, 401). Dr. Naagarkar diagnosed Plaintiff with generalized anxiety disorder and probable bipolar disorder, and assigned him a GAF of 55 (*Id.*).[19]

On August 11, 2008, Plaintiff saw LLP Rivest: he felt very emotionally fragile, and was unable to be around people without being on his medication (Tr. 324). LLP Rivest noted that this was the first time in a while that Plaintiff spoke openly about his feelings (*Id.*).

On August 14, 2008, Plaintiff saw Dr. Nagarkar: he was alert and oriented times three, his mood was pensive, his affect was blunted, and he had no suicidal ideations (Tr. 397-98). He

---

[19] *See supra* n. 15.

was diagnosed with generalized anxiety disorder, probable bipolar disorder, and was assigned a GAF of 55 (Tr. 398).

On September 29, 2008, Plaintiff saw LLP Rivest: he reported that he could not even leave his house to go over to his mother's house; he felt more panic and discussed a recent panic attack that occurred while he was driving – it led to a speeding ticket (Tr. 323).

On January 29, 2009, Plaintiff saw LLP Rivest (Tr. 321). He was not totally happy because of money problems; but, his medication was working better and he was able to stay focused (*Id.*). Rivest noted a decrease in Plaintiff's depression, and anxiety that was high when dealing with money problems (*Id.*).

On March 17, 2009, Plaintiff saw LLP Rivest (Tr. 320). He reported mood swings; mental racing; feelings of helplessness; and, at times, feeling as though he should go to the psychiatric ward (*Id.*). Plaintiff noted a reduction in panic attacks and was reaching out to family for support (*Id.*).

On June 9, 2009, Plaintiff presented to Dennis Lloyd, D.O. complaining of fatigue: he said that he could barely do daily activities, and was sleeping all day (Tr. 216).

On June 16, 2009, Dr. Reddy found that Plaintiff's depression and anxiety were controlled with medications (Tr. 279).

On September 2, 2009, Plaintiff was experiencing depression, anxiety, and impulsiveness; he stated that, most of the time, he was very dependent on others because he "literally physically or emotionally cannot take care of even his basic needs" (Tr. 318).

On October 8, 2009, Plaintiff saw Dr. Nagarkar; he was still having some bad days, but reported no suicidal ideations (Tr. 302).

On December 29, 2009, Plaintiff complained to Dr. Nagarkar that his depression was bad; his panic attacks had come back; and, he had lost weight (Tr. 301). Plaintiff was not experiencing suicidal ideations (*Id.*).

On March 30, 2010, Plaintiff returned to Dr. Gotlib because his insurance company required a psychiatric evaluation (Tr. 336). Plaintiff reported that he was in the process of getting a divorce, which had augmented his psychiatric symptoms; was out of work because of mental illness disability; and, was fighting workman's compensation (*Id.*). He continued to take Lexapro; his Xanax and Adderall prescriptions had been increased in January; and, he began taking Abilify in January (*Id.*). Plaintiff reported frequent suicidal feelings, but no plans; decreased interest and energy; poor concentration; sleep problems, continual mood swings, and panic attacks; but, no psychotic symptoms or need to go to the hospital (*Id.*). On exam, Dr. Gotlib noted Plaintiff had an anxious mood; unremarkable psychomotor behavior; denial of suicidal ideation; full orientation; no trouble with concentration or memory; and, no perceptual disturbances (*Id.*). He assigned Plaintiff a GAF of 50 (*Id.*).[20]

### 3. Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could perform light work with the following limitations: no climbing of ladders and stairs; occasional stooping; no kneeling, crouching, or crawling; frequent handling, fingering, and reaching; no reaching above shoulder level with the left arm; and, no exposure to hazards or vibrations (Tr. 50). The individual would also be limited to simple one- and two-step tasks; low stress work that involved no fast pace,

---

[20] *See supra* n. 15.

quotas, or assembly line work; no interaction with the public; and, only occasional and superficial contact with coworkers and supervisors (*Id.*).

The VE testified that such an individual could not perform Plaintiff's past relevant work (*Id.*). But, the individual could perform other jobs in the national and regional economy in both the light exertional category – cleaners, stock clerks, general office clerks – and the sedentary category – general office clerk; bench assembler, stock handler, and packager (Tr. 50-52). Such jobs did not require driving or the operation of controls, and typically permitted no more than one absence a month (Tr. 52).

In response to questions from Plaintiff's counsel, the VE also testified that work would be precluded if the individual – for twenty percent of the time, or one day a week – was off task or nonproductive; unable to perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances; or, unable to complete a normal workday and workweek without interruptions from psychologically based symptoms and unable to perform at a consistent pace without an unreasonable number and length of rests periods (Tr. 53). Additionally, the VE testified that if the individual required a sit/stand option, all enumerated sedentary positions would allow for it; but, the cleaning position would not (Tr. 53-54).

### D. Plaintiff's Claims of Error

Plaintiff's overarching argument is that the ALJ erred in her credibility determination and, in turn, presented an inaccurate hypothetical question to the VE.[21] Plaintiff argues that the

---

[21] Plaintiff also implies that the ALJ erred in her application of the treating source rule; he refers to SSR 96-8, which states that an RFC must "always consider and address medical source opinions," alongside 20 C.F.R. § 404.1527(d)(2), and emphasizes the proper weight to be given to treating source opinions (Dkt. No. 8 at pp. 12-14 (CM/ECF)). However, the record contains no medical opinion evidence prior to March 30, 2010, and the ALJ expressly noted this in her opinion (Tr. 27).

ALJ should have found him disabled prior to March 30, 2010, because the VE testified that more than one unexcused absence per month would be work preclusive (Dkt. No. 9 at 12).

Plaintiff bears the burden to establish a prima facie case of disability. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). At step five, the burden shifts to the Commissioner to show that Plaintiff has the capacity to perform work in the national economy. *Id.* This burden must be met with a finding supported by substantial evidence. *Parley v. Sec'y of HHS*, 820 F.2d 777, 779 (6th Cir. 1987). Substantial evidence may be shown through reliance on a VE's testimony in response to a hypothetical question, as long as the question accurately describes Plaintiff's physical and mental impairments, and takes Plaintiff's limitations into account. *Id.* at 779-80. The hypothetical question need not incorporate limitations the ALJ does not find credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir.1993). And, "[c]redibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ." *Strevy v. Comm'r of Soc. Sec.*, No. 1:12–cv–634, 2013 WL 54472803, at *8 (W.D.Mich. Sept. 30, 2013) (citing *Gooch v. Sec'y of HHS*, 833 F.2d 589, 592 (6th Cir.1987)). This Magistrate Judge finds the ALJ provided sufficient reasons for rejecting Plaintiff's claim of total disability prior to March 30, 2010.

In her decision, the ALJ stated that "[Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms but the statements concerning the intensity, duration and limiting effects of the claimant's symptoms prior to March 30, 2010, are not entirely credible and are not fully consistent with the totality of the evidence" (Tr. 28). The ALJ discussed the reasons for her finding. As to Plaintiff's physical limitations, the ALJ noted that Plaintiff's April 2008 and May 2009 radiology studies, apart from some mild to moderate findings with respect to left foraminal narrowing, were largely normal or unremarkable (Tr. 25-

26, 259, 270); Plaintiff's April 2008 imaging studies were negative (Tr. 25, 269); Plaintiff's physical therapy lasted two visits, during which he reported pain at a 6 out of 10 because he had been working on a motor; and, his September 2009 physical examination revealed no abnormalities (Tr. 26). Plaintiff points to various treatment notes – for instance, on April 16, 2008, August 21, 2009, and October 20, 2009 – which indicate that he complained of back pain. But no medical evidence indicates that Plaintiff complained of *disabling* back pain, and no medical source indicated such a prognosis in their treatment notes (Tr. 204, 212, 231).

As to Plaintiff's mental limitations, the ALJ noted that an April 2008 progress note indicated that Dr. Gotlib was concerned that Plaintiff might have "some malingering symptomology"; and, in May of 2008, Plaintiff reported that he was not sure he could ever return to work, but was alert and oriented on mental status examination – Dr. Gotlib told Plaintiff not to return to his clinic for disability (Tr. 27). The ALJ also noted treatment notes indicating that Plaintiff's condition was controlled with medication; consistent reports of no suicidal ideations; and, that Plaintiff has never required inpatient psychiatric hospitalization (Tr. 25-27, 340). In October 2009, Plaintiff indicated that he was "doing okay" and "getting a lot more done," despite "some bad days" (Tr. 28).

Plaintiff says it is "clear from the medi[c]al evidence and his testimony that he would in fact be unable to maintain substantial employment on a consistent and ongoing basis [] prior to March 30, 2010[.]" (Dkt. No. 9 at 12). But, his support lies in citations to medical documentation that the ALJ explicitly discussed in her opinion and utilized in determining Plaintiff's RFC, and it is unclear how Plaintiff would ask this Magistrate Judge to interpret these findings differently. Moreover, the ALJ's RFC determination mirrored the hypothetical questions she posed to the VE – Plaintiff does not contest the ALJ's RFC determination (Tr. 25, 52).

The ALJ also clearly explained her reasons for finding a change of conditions on March 30, 2010, and those reasons are supported by substantial evidence. She noted that, although Plaintiff was not disabled on his alleged disability date in March of 2008, "there is evidence that the claimant's psychological condition deteriorated after the alleged onset date of disability." (Tr. 30). That date, the ALJ explained, marks a change in the Plaintiff's condition: he began reporting suicidal ideations; he experienced a significant and rapid loss of weight; and, his reported symptoms and limitations were consistent with the findings and opinions of medical sources (Tr. 29-31, 336). For example, on April 6, 2010, LLP Rivest opined that Plaintiff had "no ability to cope with any kind of pressure" (Tr. 30, 304); and, in August of 2011, Dr. Nagarkar opined that Plaintiff had markedly limited abilities to relate with others, and extremely limited abilities to maintain concentration and withstand the stress associated with day-to-day work activity (Tr. 32, 416).

This Magistrate Judge finds substantial evidence supports the ALJ's finding that, prior to March 30, 2010, Plaintiff could perform light work with the additional restrictions provided in the ALJ's RFC. Her decision should not be disturbed on appeal.

## IV. CONCLUSION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific

objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon<br>
Mark A. Randon<br>
United States Magistrate Judge

Dated:  December 10, 2013

### Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, December 10, 2013, by electronic and/or ordinary mail.

*s/Eddrey Butts*<br>
*Case Manager for Magistrate Judge Mark A. Randon*